David T. Gibbons, J.
In this prosecution for the crime of possession of a weapon as a felony (Penal Law, § 265.05, snbd. 2), the defendant has applied for (1) an order to suppress certain items of personal property and United States currency in the amount of $620 (Mapp v. Ohio, 367 U. S. 643; Code Crim. Pro., § 813-c et seq.) and (2) for an order to suppress certain statements to law enforcement officers attributed to the defendant, under section 813-f et seq. of the Code of Criminal Procedure as inadmissible for failure to comply with the requirements of Miranda v. Arizona (384 U. S. 436); and as involuntary under the principles of Jackson v. Denno (378 U. S. 368) and People v. Huntley (15 N Y 2d 72). By stipulation of the parties, it was agreed that a combined hearing be conducted herein for the requested relief.
From the competent evidence adduced at this combined tearing, the court makes its findings of fact and conclusions of law as follows:
As the result of a conviction for the crime of robbery in the second degree in 1960, the defendant was sentenced to a term of imprisonment. He was released from prison in 1965 and placed on parole under the jurisdiction of the Executive Department of the State of New York, Division of Parole. During this period of parole, Mr. William Provencher was assigned in September, 1969 to supervise the defendant as his parole officer.
A robbery was committed in the Valley Stream Park Inn on Father’s Day, June 22, 1970, during which about $40,000 was stolen. On June 30, 1970, parole officer Provencher received a telephone call from Detective Rofheart of the Nassau County Police Department, who informed him that he was investigating *867 the robbery, and that he suspected the defendant’s possible involvement because of the circumstance that the defendant was the last patron at the bar, and that shortly after closing, the place was held up by two masked men.
After reviewing the defendant’s file, parole officer Proveneher agreed with Detective Bofheart that the defendant might have been involved since he was the last patron in the place.
On July 13,1970, Detective Bofheart telephoned parole officer Proveneher and there ensued a conversation initiated by Detective Bofheart concerning a contemplated search of the defendant’s residence.
The court finds that Detective Bofheart requested Provencher’s “ cooperation to search John Way’s house ” for the purpose of investigating the robbery of the Valley Stream Park Inn, • and that the latter acceded to this request. Bofheart made arrangements to meet with Proveneher at the defendant’s residence on the following day, July 14,1970.
In the two-week interim between their two conversations, neither the parole officer nor the police had obtained search or arrest warrants for the defendant, nor had parole officer Proveneher made a written report of these developments to his superior. The parole officer did not communicate with, or supervise the defendant during this period, and visited the defendant’s home at the convenience and instance of the police, who called Proveneher to arrange the visit.
On July 14, 1970, the parole officer drove to the defendant’s home, a one-family dwelling at 89 Clement Avenue, Elmont, New York. Detective Bofheart, accompanied by Detective Schramm, arrived there in a police vehicle. They met at about 8:45 a.m. and were admitted into the house by the defendant who was then clad in his underwear. Parole officer Proveneher told him, “We are searching the house”. Detective Bofheart remained at the kitchen table with the defendant while Detective Schramm and parole officer Proveneher searched the defendant’s bedroom where a box of .38 caliber ammunition was found in a dresser drawer.
The parole officer then described the continuing search with Detective Schramm in the following language: “We proceeded to the living room, searched the living room with the thought that there might be a weapon in the home to go with the ammunition. We found nothing upstairs and Detective Schramm and I went to the basement ”.
While en route to the basement, they passed the kitchen where Detective Bofheart and the defendant were conversing. Parole *868 officer Provencher described what he heard as follows: “ Yes, I do recall a fragment of the conversation. There was something that John did say with regard to his being with his father on Father’s Day.”
The cellar was partly finished and in the course of searching they observed an opening in the ceiling. The parole officer reached his hand up into the opening and touched a red manila envelope which was concealed in the ceiling structure. As the parole officer tugged at the red manila envelope, a gun and a rag in which it was wrapped, fell from its hiding place to the floor. The parole officer then pulled down the red manila envelope in which there was a paper bag containing bullets and a gun-cleaning kit. The parole officer then reached up again into the opening and found 31 $20 bills, held together by a rubber band. In the course of searching the cellar, Detective Schramm pulled out portions of the ceiling material.
The parole officer describes the events following the discovery of the gun as follows: “ After we examined the gun in the rag, wrapped, I think Detective Schramm was holding the gun as a matter of fact. I examined it while it was in his hands, put it back in the cloth, put it back in the bag with the shells in it ’ ’.
When they returned to the kitchen again, parole officer Provencher turned over the items which they found in the basement to Detective Rofheart ‘ ‘ to hold it while Detective Schramm and I searched the upstairs ’ ’.
After the searching had been completed, the parole officer advised the defendant that he had violated his parole. He then placed his handcuffs on the defendant and told him that he was taking him to the New York State parole office in Hempstead. They proceeded in the parole officer’s vehicle to the Division of Parole in Hempstead. Detective Schramm and the defendant sat in the back seat. Parole officer Provencher drove the car.
En route from Elmont to Hempstead, Mr. Provencher questioned the defendant about the pistol which was found in the premises. The defendant denied ownership of the pistol, but he claimed that the money was his.
When they arrived at the parole office in Hempstead, the parole officer removed his handcuffs from the defendant’s wrists and Detective Schramm arrested him for the crime which is the subject matter of this indictment, and, at the same time, placed his handcuffs on the defendant. Prior to Detective Rofheart’s conversation with the defendant at the kitchen table concerning matters relating to the robbery which Rofheart and Schramm were investigating, no one advised the defendant of his constitutional rights, nor did he waive them.
*869 It is conceded that up to the time the defendant was formally arrested by Detective Schramm, no one had advised the defendant of any constitutional rights as required by Miranda v. Arizona (384 U. S. 436, supra).
The court is now called upon, under the particular facts and circumstances of this case, to pass upon the legality of evidence resulting from the search of a parolee’s home where the search was arranged at the request of the police, who, while investigating the commission of a crime, and without such probable cause as would justify the arrest and search of the defendant parolee as a perpetrator thereof, participated in the search with the defendant’s parole officer.
The principle of law pertaining to the diminution of a parolee’s Fourth Amendment protection against unreasonable search and seizure by his parole officer, is well established in this and most other jurisdictions. (People v. Randazzo, 15 N Y 2d 526, cert. den. 381 U. S. 953 [1965]; People v. Santos, 25 N Y 2d 977; People v. Langella, 41 Misc 2d 65; People v. Chinnici, 51 Misc 2d 570; People v. Sichler, 61 Misc 2d 571; People v. L’Hommedieu, 62 Misc 2d 925; U. S. ex rel. Randazzo v. Follette, 418 F. 2d 1319.)
Essentially, this case involves a consideration of the question whether this principle of law will he applied where the search of a parolee’s home is police-inspired and made to facilitate their entry into the residence for the purpose of investigating a parolee’s involvement in an armed robbery.
The limitation infused into a parolee’s constitutional rights rests upon a twofold rationale, which is (1) that while on parole status he remains in the constructive custody of the State and is, therefore, possessed of no greater rights than a prisoner confined within a penitentiary, and (2) that parole is “an act of grace ’ ’ to one convicted of crime, and may be coupled with such conditions as the State may impose while he is serving his sentence outside the prison walls. (Escoe v. Zerbst, 295 U. S. 490, 492.)
As stated in Fleming v. Tate (156 F. 2d 848, 850) parole involves an ‘1 enlightened effort on the part of society to rehabilitate convicted criminals ”. This process requires a qualitative selection by the Parole Board of those convicts who may profit from an opportunity to live in society by serving part of their sentence outside of the penal institution under the guidance and supervision of specially trained personnel of the State Parole Board. All of this being with the hope that in the process, the parolee will adopt a new sense of moral values and thereby become a law abiding citizen without continued supervision.
*870 It is axiomatic that to effectuate this purpose, there must exist a close relationship between the parolee and his supervising parole officer, who must assume the role of both advisor and keeper. Accordingly, the parolee’s Fourth Amendment rights have been suspended by the many decisions above listed to allow his parole officer to freely search him and his abode when he suspects that the parolee may have lapsed into criminal ways. Similarly, because of his parole status, there is also a suspension of his constitutional rights against self incrimination under the Fifth Amendment to facilitate interrogation by a parole officer. (People v. Ronald W. [Anonymous], 24 N Y 2d 732.)
If his privacy is to be invaded from time to time for the protection of the public, and for his rehabilitation, this may be done only by his parole officer in the course of and for the purpose of effectively supervising him. This may not be done for the prime purpose of circumventing the ordinary constitutional processes for the convenience of law enforcement officers in the course of their investigation.
This diminution of the parolee’s constitutional rights exists only with respect to the dealings between himself and his parole officer. This rule, of necessity, however, does not run in any other plane to be exploited by others.
Whatever is taken from the parolee’s constitutional rights, is taken as a necessary measure to facilitate his parole officer’s task of rehabilitating him, and where, insofar as his parole officer is concerned, he must, on inquiry, reveal all of his action and submit to searching on reasonable demand, on nothing more than suspicion, it does not follow that police officers possess the same right.
As to the police, his constitutional rights remain intact, completely undiminished and inviolate, and entitled to the same protection as the constitutional rights of others. No contrivance or scheme will be countenanced by which such constitutional right will be by-passed. The United States Supreme Court in Byars v. United States (273 U. S. 28, 32 [1927]) held that “ the court must be vigilant to scrutinize the attendant facts with an eye to detect and a hand to prevent violations of the Constitution by circuitous and indirect methods ’ ’.
In Lustig v. United States (338 U. S. 74), where a Federal secret service agent joined with city police in the search of a hotel room and after assisting them in gathering up the articles revealed by the search, he took them for use as evidence in furtherance of a counterfeiting prosecution, the Supreme Court elaborated on the rule of the Byars case in the following lan *871 guage (pp. 78-79): “ The crux of that doctrine is that a search is a search by a federal official if he had a hand in it; it is not a search by a federal official if evidence secured by state authorities is turned over to the federal authorities on a silver platter. The decisive factor in determining the applicability of the Byars case is the actuality of a share by a federal official in the total enterprise of securing and selecting evidence by other than sanctioned means. It is immaterial whether a federal agent originated the idea or joined in it while the search was in progress. So long as he was in it before the object of the search was completely accomplished, he must be deemed to have participated in it. Where there is participation on the part of federal officers it is not necessary to consider what would be the result if the search had been conducted entirely by State officers. Evidence secured through such federal participation is inadmissible for the same considerations as those which made Weeks v. United States, 232 U. S. 383, the governing principle in federal prosecutions.”
While with respect to a parolee there is not so stringent a restriction imposed upon the joint efforts of a parole officer and the police, nevertheless these joint efforts are not without limitations. Where the search is instigated, initiated, directed, arranged, controlled and participated in by the police and where the prime purpose of the search is not the supervision of the parolee, but the furtherance of police investigation in a manner designed to avoid usual constitutional amenities, then the restriction comes into play. The-finding that the police were the prime movers and motivating fdree to initiate this search, coupled with the finding of participation by law enforcement officers, who must act under constitutional authority, with others not so restricted, is the determinative factor which results in the exclusion of the fruits of the joint search as legal evidence. Under such circumstances, the fact that it is the party not under such constitutional restraint together with law enforcement officers who finds the articles, does not convert the enterprise to a private search. • (People v. Brown, 34 A D 2d 108.)
In People v. Santos (25 N Y 2d 976, 977, cert. den. 397 U. S. 969) the Court of Appeals, in a case involving a search by a parole officer with a police officer present, ruled the search legal because it was found ‘ ‘ that the parole officer, but not the police officer, then searched defendant’s room ”.
With an awareness that parole officers., and police officers may, and frequently do, co-operate with each other, as for example, a policeman may make an arrest upon'a parole violation, or he may accompany a parole officer into a parolee’s residence for *872 his protection as -in People v. Santos (supra), or supply him with information touching upon a parole violation as in this case. The police officer may not, however, when lacking the essential constitutional ingredient of probable cause to legally make a search by virtue of his own right, induce a parole officer to search a parolee’s home so that he may accompany him and search for evidence of crime for use upon a prospective criminal prosecution.
Such contrivance of using the parole officer as his “ agent, tool or device ” to make a search without probable cause was declared to be illegal in United States v. Hallman (365 F. 2d 289 [C. A. 3d]) and where such circumstances exist. “ The parole agent’s physical presence, even his nominal conduct of the physical acts of search, does not signalize validity. The purpose of the search, not the physical presence of a parole agent, is the vital element. ’ ’ (People v. Coffman, 2 Cal. App. 3d 681, 688.)
When the “ attendant facts ” of this case are examined, it becomes manifestly obvious that this search of the defendant’s abode was inspired by, requested, arranged for, participated in, and dominated by Detective Rofheart and Detective Schramm. Although the police report to the parole officer, that the defendant was the last patron at the bar premises just before the holdup, provided enough information to cast suspicion upon the defendant and warrant his immediate interrogation, he neither visited the defendant nor filed a report with his superior nor obtained a search or parole violation warrant. He was not bestirred into any action until almost two weeks, after he heard the report "of .the robbery. By his accommodation of the police, he became nothing more than the alter ego of the detectives, to enable them, by using his particular status, to accomplish a search and seizure upon nothing more than mere suspicion.
The parole officer’s role in this matter is best described by the following language of People v. Coffman (p. 689, supra) as follows : ‘1 The parole agent was not engaged in administering his supervisorial function. He had not instigated the search nor evinced any official interest in it except in his role as a ‘ front ’ for the police. His presence was a ruse, calculated to supply color of legality to a warrantless entry of a private dwelling. The Fourth Amendment hardly lends itself to such totemism. The search was primarily aimed at ordinary law enforcement, not parole administration. Law enforcement searches are heartily to be encouraged, but by means sanctioned by the Constitution. Defendant was in jail and the Chico police had ample time and opportunity to secure the search warrant mandated by the Fourth Amendment. They chose the parole agent *873 rather than a search warrant as their ticket of entry to the apartment. The search was illegal and its evidentiary products inadmissible.”
Had the police gone to the defendant’s abode alone and carried on the same searching efforts, the motion would be granted without the slightest hesitation in view of the conceded lack of probable cause. The presence and collaboration of the parole officer in the search cannot change the purpose of the search nor give their endeavors the badge of legality.
This case does not present the usual situation where a parole officer may engage the services of the local policeman on the beat to protect him while he is engaged in searching a parolee or his home. Reference to the facts found herein demonstrate that the police were not mere bystanders but that they inspired, initiated, arranged and actively participated in every phase of the search and seizure. Detective Schramm went from room to room and to the basement with the parole officer. He gave active assistance in the searching. He examined the weapon after it was handed to him by the parole officer. He broke the ceiling material in furtherance of the searching effort. Each item found during the search was assembled in the custody of Detective Rofheart who was in the kitchen with the defendant conversing with defendant with respect to matters relating to the robbery. (Lustig v. United States, supra; United States v. Hallman, supra.)
The court is not concerned with the legal effect of the items revealed by this search upon the defendant’s parole status. Its concern is with the legality of the articles uncovered by the search as evidence in this prosecution. As to the latter, for the reasons hereinabove set forth, the defendant’s motion to suppress such articles is granted in all respects.
With respect to the defendant’s companion motion to suppress any statements made by the defendant while in custody of the parole officer and the police, the same is also granted as the direct product of a violation by the police of the defendant’s constitutional rights. (People v. Rodriguez, 11 N Y 2d 279, 286.)