Thomas Dickens, J.
This motion, brought by defendant, is designed to have certain contraband suppressed, the contraband having been found in defendant’s premises by parole officers after they had arrested defendant for violating his parole, and also to have his oral statement suppressed concerning the contra *1064 band in question, which was allegedly made to them by defendant after his arrest. Both issues are made the targets of invalidity on the contention of their being violative of the Fourth and the Fifth Amendments, respectively.
These alleged illegal blights had occurred in. conjunction with the arrest of defendant by the probation officers because of the violation of his parole, that is, violation of1 his “ ticket of leave,” as the word “ probation ” is denominated in Ballentine’s Law Dictionary ([1930 ed.], p. 1282).
In the face of the foregoing specific facts, the following vital question comes to the fore as the whole point of the dual problem: Did the parole officers ’ conduct prove arbitrary and in excess of their power and authority in the performance of their capacity as public ’ functionaries by their assuming to search defendant’s premises after having arrested defendant for a violation of his parole, and also, did they intrude on defendant’s right to be silent by their obtaining through prodding solicitation a statement from him regarding the contraband that should be condemned as being a statement reluctantly given?
Before delving into the legal phase of this motion, a summary review of some of the salient testimony will prove revealing and enlightening at this stage.
One of the parole officers involved here had, according to the record, received a tip from an anonymous caller that defendant was selling narcotics from premises 129 First Avenue, apartment 1-A. Thereupon, on December 21, 1972, after getting a detainer warrant, his partner and he went to the afore-mentioned premises, where they proceeded to the lobby of the building and there examined the names listed in the mailboxes, the purpose being to trace the apartment and, when located therein, then to take him into custody. When they had identified the box for apartment 1-A, they found it to bear the name of “ Zeniti.” Upon that, they left the building and moved to take positions across the street from the premises. At this vantage point, they were eventually enabled to place the window of apartment 1-A under their surveillance. Soon they saw defendant come to the window and look out. He looked like the person on the photograph that the officers had of him. Fearing that he might have a weapon, they waited, therefore, until he came out of the building, saw him cross the street, and then enter a restaurant. They followed him there, where they placed him under arrest and then searched him. The search yielded' a set of keys, which was taken from him, together with a social security card bearing the name of ‘ ‘ Zinetti. ”
*1065 With the confiscated keys in their possession, the officers, having defendant in tow, entered the afore-mentioned building, and with the aid of a particular key from the bunch, they made entry into the apartment from which they had observed defendant looking out the window. They thereupon proceeded to search the apartment with the result that they soon uncovered the contraband consisting of' narcotics and narcotic paraphernalia, and a weapon, that is, a gun.
The legal principles that follow tend to buttress the power and the authority exercised by the parole officers in making this search and seizure. The cumulative effect of these principles sets the groundwork for the ratio decidendi of this decision.
Beginning with a general observation of the consequences of a parolee’s breach, I find that a prisoner who breaks his parole is, as pronounced in law, to be in the same plight for most purposes as one who had escaped (People ex rel. Newton v. Twombly, 228 N. Y. 33, 36; People ex rel. Dote v. Martin, 269 App. Div. 59, affd. 294 N. Y. 330).
Then again my deduction, based upon the interpretation of the context of the case of Sackler ,v. Sadder (15 N Y 2d 40), leads me to the impressive conclusion that government officers and agents are clothed, when warranted, with power and authority to make a search and seizure of1 the kind in question; and so, it naturally follows therefrom, as to agency, that a parole officer falls within the category of a governmental agent.
Within the compass of both these instructive observations, I conclude that a parolee’s constitutional rights are not absolute or sacrosanct within the Fourth Amendment, but qualified. If so> a parolee personally, or his premises, in a broad sense, may be searched by his parole officer when the officer suspects that the parolee may have again lapsed into criminal ways by running afoul of the law (People v. Way, 65 Misc 2d 865). For emphasis, it will not be amiss to quote the court’s exact language here (p. 21): “Accordingly, the parolee’s Fourth Amendment rights have been suspended by the many decisions above listed to allow Ms parole officer to freely search him and his abode when he suspects that the parolee may have lapsed into criminal ways.” (Emphasis supplied.)
The following excerpt from People v. Santos (31 A D 2d 508, 509) throws additional informative light on the powers and the authority of a parole officer with respect to a parolee’s resumption of a new life of crime or other wrongdoing. “ The very concept of parole entails a degree of .supervision of parolees consonant with its purposes. Included within that supervision *1066 would be such searches as would reasonably be called for. It cannot be questioned that the Parole Officer had reasonable grounds for investigation as to whether the defendant here was violating his parole and that the search was a proper incident of that investigation. In that context, it was reasonable.” (Emphasis supplied.)
In sum and substance, then, a parolee’s Fourth Amendment rights, in their qualified scope, are subject to the kind of conduct that is circumscribed by law and restricted to the terms of his parole. The whole concept underlying the theory of parole is to give to the convict a chance to embrace good conduct and thereby to return to society in acceptable form, so that he could rehabilitate himself with the help and the guidance of the Parole Board, such help and guidance to be administered by highly trained personnel (Morrissey v. Brewer, 408 U. S. 471). On the other hand, as already noted, however, if and when the parole officer suspects that the parolee may have returned to a life of crime, or resorted to prevarication, he is free to search the parolee’s person and/or his home (People v. May, 65 Misc 2d 865, supra; People v. W. [Anonymous], 24 N Y 2d 732; People v. Santos, 31 A D 2d 508, supra). The legal effect of the parolee’s diverting by aberrations from the law is that the parolee suffers a consequential suspension of the benefit of his protective rights as provided by the Fourth Amendment (People v. Way, supra, People v. Randazzo, 37 Misc 2d 80, affd. 15 N Y 2d 526).
Now, so far as the statement made by defendant when interrogated by one of the probation officers is concerned, my opinion is that it is immune from legal attack, inasmuch as defendant had been apprised of his rights as required by Miranda v. Arizona (384 U. S. 436) and inasmuch as he had made that statement voluntarily and freely (Jackson v. Denno, 378 U. S. 368; People v. Huntley, 15 N Y 2d 72). He must have surely been well aware of what he was doing when it is considered that he had had several brushes with the law, the experience of which no doubt must have stood him in good stead as guiding knowledge when interrogated (cf. People v. Pitts, 61 Misc 2d 343, and eases cited therein).
In short, then, his hue and cry that his protection under the Fifth Amendment against self incrimination was destroyed, amounts to brutum fulmen, for under the circumstances the normal benefit of the Fifth Amendment had become suspended (People v. W. [Anonymous], 24 N Y 2d 732, supra, cf. People v. Whitehurst, 25 N Y 2d 389, 393; People v. Way, 65 Misc 2d 865, supra).
*1067 Public wrongs and public rights are involved in the commission delicts (People v. Alaboda, 198 App. Div. 41; People ex rel. Battista v. Christian, 131 Misc. 411). In consequence, the object of every prosecution for an offense committed against the law is to punish the offender and vindicate the law (Tompkins v. Mayor, etc., of City of N. Y., 14 App. Div. 536). These inflexible theorems are today inveterate hornbook doctrines in the law.
The long and short of the panorama of the litigated issues here is that suppression must fall by the wayside, for a right cannot spring from a wrong (Ballentine’s Law Dictionary [1930 ed.], p. 712), and also, one ought not to profit by his own wrong (People v. Love, 51 Misc 2d 670, and Carr v. Hoy, 2 N Y 2d 185). Having continued to sow the wind of folly, defendant should not be made to escape the whirlwind of further legal prosecution.
The motion is denied.