THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
RAYMOND CANDELARIA, Appellant.

First Department, July 11, 1978

## APPEARANCES OF COUNSEL

*William I. Weisberg* for appellant.

*Mark Dwyer* of counsel *(Jerrold L. Neugarten* with him on the brief; *Robert M. Morgenthau, District Attorney),* for respondent.

## OPINION OF THE COURT

SULLIVAN, J.

Defendant, Raymond Candelaria, appeals from a conviction

of murder in the second degree. At issue is the legality of a warrantless search of a parolee's home by his parole officer.

The deceased, Luis Julia, and Candelaria lived in the same building. On occasion Candelaria worked as superintendent in the building.

On the evening of June 23, 1974, Julia and Candelaria quarreled over Candelaria's intrusion into a conversation between Julia and an unidentified neighbor about a plumbing leak. Candelaria took offense at the manner in which Julia rebuked him, stated that he was "a man" and that no one could talk to him that way, and then drew a knife. As Julia retreated into his apartment Candelaria threatened to get a gun and shoot him. As it later developed, this was Candelaria's second recent threat, as 10 days earlier, taunted by neighborhood boys, he warned them that he would use a .22 calibre gun on anyone who "played around with him."

The next day, at about 1:15 in the afternoon Candelaria showed Lydia Radu, another tenant, a gun, and told her that he was going to "kill the guy." Radu attempted to dissuade him but he ignored her entreaties, and insisted "No, I'm gonna kill the guy. I can't take that from him."

About an hour later, Julia returned home from work and, as he passed under his apartment window, whistled to his wife, as was his habit. Mrs. Julia came to the window and they spoke. When they finished speaking, Julia turned to walk to the entrance of the building. At this point, Linda Wilson, a seven-year-old girl, saw Candelaria emerge from an alleyway and shoot Julia. At trial she testified that she saw two other men nearby, but they were not involved in the shooting.

When Mrs. Julia heard the shots she rushed downstairs and saw Candelaria turning a corner a block away. When the police arrived Mrs. Julia related the argument between Candelaria and her husband on the previous evening.

About an hour later, Candelaria called his landlord and told him that Julia was dead. At six o'clock Detective Drafts, who was assigned to the case, located Candelaria at the apartment of Wilbur Candelaria, his nephew. Candelaria admitted to Drafts that he was at the building that afternoon at 2:15, but claimed that one of two men with Julia shot at him and he ran away. (From this account and a statement made later, at the precinct, Candelaria would not have known that Julia was dead, or even that he had been shot, to justify his statement to the landlord earlier.)

The next day Candelaria, who was on parole, kept his regular appointment with his parole officer. But since his assigned officer was not present, Candelaria spoke to Officer Pasternack and informed him of the questioning by Detective Drafts the night before. He also told Pasternack that he had been involved in an argument on June 23, 1974 in which he had pulled a knife for his own protection.

Several hours later, during the course of further interrogation of Candelaria, Drafts telephoned Pasternack to ask whether Candelaria could be arrested for a parole violation. Pasternack told Drafts that Candelaria could be arrested only if an independent investigation produced a witness to either the knife incident or the homicide.

Drafts then called Mrs. Julia and asked her to report the knife incident to Pasternack. Mrs. Julia met Pasternack that evening and repeated her account of the argument between Candelaria and her husband. After speaking with his supervisor, Pasternack wrote out a temporary detainer warrant based on the knife incident. Pasternack also called Drafts, learned that Candelaria was with him at the station house, and proceeded there to arrest him. From there, Pasternack and two other parole officers, along with Candelaria and Drafts, went to Candelaria's apartment to search for "knives, contraband, narcotics, anything that is considered contraband."

At the apartment Drafts remained in the living room with Candelaria, now a prisoner, while the three parole officers searched. Among the contraband discovered were knives, including a machete, marihuana and 18 cartridges in a jewelry box in Candelaria's bedroom. As the parole officers uncovered possible contraband they brought it to Drafts for his inspection. However, when the bullets were found, Drafts was called into the bedroom. He took the cartridges, which were the same .22 calibre long-rifle type as the two bullets removed from Julia's body.

At trial the People's principal witness was eight-year-old Linda Wilson (seven at the time of the shooting). She recognized Candelaria, as she had seen him on the street several times and knew him to be the building superintendent. Linda saw Candelaria shoot Julia, and Candelaria almost bumped into her as he attempted to flee.

Her eight-year-old friend, Mary Warden, gave evidence, although unsworn, that she only saw the back of the killer's head, that the killer had black hair (Candelaria's hair was

gray), and that she did not think that Candelaria looked like the killer. Mary Warden confirmed Linda Wilson's testimony that there were two other men nearby at the time of the shooting.

On appeal Candelaria argues that he was deprived of a fair trial by the court's swearing of Linda Wilson, by the suppression of exculpatory evidence, and by the admission of the .22 calibre bullets seized by parole officers in the search of his apartment.

■ "Probation authorities * * . * have a special and unique interest in invading the privacy of probationers" which "does not extend to law enforcement officers generally." *(United States v Consuelo-Gonzales,* 521 F2d 259, 266.) Thus, "a parolee's constitutional right to be secure against unreasonable searches and seizures is not violated when his apartment is searched, without a search warrant, by his parole officer if the latter's conduct is rationally and reasonably related to the performance of his duty as a parole officer." *(People v Huntley,* 43 NY2d 175, 179.) Even where a parole officer undertakes a warrantless search of a defendant's apartment in the presence of a New York City detective, the courts have refused to suppress the fruits of the search from use in a subsequent criminal prosecution: "In order to discharge its statutory duty, the Board must obtain all the facts and circumstances surrounding a parole violation. This requires that parole officers be vested with authority to search parolees in situations which would be impermissible if directed against ordinary citizens." *(United States ex rel. Santos v New York State Bd. of Parole,* 441 F2d 1216, 1218.)*

In *Huntley (supra),* the Court of Appeals discussed the relevant factors in determining whether a search was conducted for parole purposes. Significant to the court was the lack of evidence "that the searching parole officers were seeking contraband or evidence in aid of prosecution for criminal activity." (43 NY2d, at p 182.)

In *Santos (supra,* p 1217) where the facts, at least on the surface, are similar to these, the court justified the search by finding that "[t]he detective did not assist in the search." The court concluded that, although the initial information came from the police officer, who was present at the search, the

---

* But, see, *United States v Bradley* (571 F2d 787), which held that unless one of the exceptions to the Fourth Amendment warrant requirement is available, a warrantless search of a parolee's home is unlawful.

parole officer was, in fact, searching to determine if the defendant had violated parole by engaging in criminal activity.

We find that the parole officers here were not seeking to ascertain proof of a parole violation, but rather were acting as agents of the police, thereby enabling the police to circumvent constitutional requirements. The search of Candelaria's apartment was clearly designed to elicit evidence of Julia's murder, and not evidence that Candelaria had violated parole by threatening Julia with a knife.

Pasternack and Frost, another of the searching parole officers, admitted that they were looking for a gun in the apartment, and Frost testified that he was looking for the gun that had committed the "alleged homicide." After the parole officers turned the bullets over to Drafts, who was orchestrating the proceedings from the living room, they terminated the search. They did not even search the kitchen, where a knife most likely would be found. Although Drafts denied looking for a gun in Candelaria's apartment, he did admit that when he went to the apartment of Candelaria's nephew, Wilbur, he overturned pillows on the couch and looked around the room for a gun.

Certainly, evidence properly seized incidental to a search of a parolee's premises for other contraband may be used in a criminal prosecution, if the search was properly commenced. (*People v Randazzo,* 15 NY2d 526, cert den 381 US 953.) But a parolee's status ought not to be exploited to allow a search which is designed solely to collect contraband or evidence in aid of the prosecution of an independent criminal investigation. (Cf. *People v Huntley,* 43 NY2d 175, 182, *supra.)* When the search is of such a nature, the parole officer becomes the conduit of the police officer in doing what the police officer could not do himself.

Fundamental to the legality of this search is the question of whether the warrantless search was necessary at all. Pasternack testified that mere possession of a knife was not a parole violation. Certainly, production of the knife was not essential to sustain a violation as to the incident between Candelaria and Julia the evening before the homicide. Mrs. Julia was a witness and, in fact, Candelaria had threatened her with the knife. There was no factual exigency requiring the parole officers to take Candelaria to his apartment after the arrest. If they wanted to search for a knife they could have applied for

a warrant. The fact is, they did not even have a description of a knife.

*Santos* (441 F2d 1216, *supra)* is distinguishable, in that there the police officer had information which, the court found, gave him reasonable grounds to believe that the parolee was "dealing" in stolen goods. Hence, a search of his apartment for the stolen goods was necessary to determine if he had, in fact, violated parole. Thus, the search was reasonably related to the parole officer's statutory duty. Moreover, and most importantly, the information furnished by the police officer itself provided reasonable grounds to believe that the parolee was involved in criminal activity. Accordingly, the search did not violate the parolee's right to be secure against unreasonable searches and seizures. (Cf. *Morrissey v Brewer,* 408 US 471; *Hyser v Reed,* 318 F2d 225, 243.) Here, however, by Pasternack's own testimony, there were insufficient grounds to take any action against Candelaria on the homicide, absent the production of a witness. The temporary detainer warrant was not issued until Mrs. Julia had given her account of the knife incident. As already discussed, the search was neither reasonable nor necessary to that arrest. (Cf. *Chimel v California,* 395 US 752.)

■ We find that, in searching Candelaria's apartment, the parole officers were acting as the agents of the police officer in his efforts to find incriminating evidence as to the homicide. Their presence cannot shield "what was plainly the action of the arresting officers to effect an illegal search." *(United States v Hallman,* 365 F2d 289, 292; see, also, *People v Way,* 65 Misc 2d 865.) Consequently, the motion to suppress the bullets taken from Candelaria's apartment should have been granted. In the circumstances of this case, their admission in evidence constituted reversible error.

Although we need not reach the other issues raised, we do find that there was no abuse of discretion in taking the sworn testimony of the witness Linda Wilson.

The judgment, Supreme Court, New York County (MELIA, J.), should be reversed, on the law and on the facts, defendant's motion to suppress the bullets seized in the search of his apartment granted, and a new trial ordered.

SILVERMAN, J. P., FEIN, LANE and SANDLER, JJ., concur.

Judgment, Supreme Court, New York County, rendered on January 27, 1976, unanimously reversed, on the law and on

the facts, defendant's motion to suppress the bullets seized in the search of his apartment granted, and a new trial ordered.