OPINION OF THE COURT
James M. Kindler, J.
Defendant, charged with attempted criminal possession of a weapon in the fourth degree (Penal Law §§ 110.00, 265.01 [1]), moved in an omnibus motion to suppress a gun recovered following the search, by parole officers, of the apartment in which he resided and statements that he made to the police after his arrest. An evidentiary hearing was held on September 2, 3 and 17, 2010, at which Parole Officers Luis Loftin and Ronnita Campbell, Sergeant William Estrada, Detective Alejandro Zapata, and Police Officer Andrew Ulich testified for the prosecution and defendant testified in his own behalf. Both parties filed post-hearing written submissions. Defendant’s principal contentions are that (1) the People failed to demonstrate the police acted lawfully in stopping and seizing defendant; (2) the certificate of release, signed by a parolee who lived in the apartment, was insufficient to permit a search of the apartment in the absence of reasonable suspicion; (3) the search was a police initiative “disguised as a ‘parole operation’ in an effort to avoid Constitutional implications”; and (4) the People failed to serve proper CPL 710.30 notice and, thus, the defendant’s statements to the police should be precluded; alternatively, he asks that they be suppressed.
Following the People’s request, the hearing was reopened on November 1, 2010 and Parole Officer Derek Jones testified for the prosecution.
*869 Based on the evidence adduced at the hearing, and for the reasons discussed below, defendant’s motion to suppress the firearm and the oral statement he made to the police at the apartment is granted and the motion to suppress the written statement and the second oral statement is denied.
Findings of Fact
The court credits the testimony of the parole officers and police officers, except as indicated below, and does not find the testimony of defendant credible to the extent it conflicts with the testimony of the officers. The court makes the following findings of fact, based on the hearing evidence and written submission papers:
In December 2007, a special operations lieutenant in the 41st Precinct of the New York City Police Department (NYPD) contacted the New York State Division of Parole (Parole) to set up a “special operation” whereby officers from both agencies would conduct joint parole visits of parolees residing in a certain area of the Bronx. The police wanted to obtain information from the parolees regarding a string of robberies that had occurred in that area, which they believed were being committed by individuals between the ages of 16 and 18. NYPD gave Parole a list of 20 or 30 parolees of all ages that they wanted to speak with who lived in the targeted area.
On February 8, 2008, at a meeting at Parole, Parole Officer Ronnita Campbell was directed by her supervisor to choose five parolees from her 75-person case load who resided in the designated area. Officer Campbell chose five parolees who had not previously given her any “problems”; among them was John Doe Walker. Since May 22, 2007, Officer Campbell had conducted home visits at Walker’s residence roughly two or three times every month and met with him at her office biweekly. Walker was “in compliance with all [of] his [Parole] rules and regulations” and Officer Campbell believed “that [he] would be the one person that [she] would not have any problems [with] at his residence.” Walker was not a suspect in the robberies and was not believed to have any contraband or weapons in his apartment.[1] Although Walker had signed a certificate of release on April 17, 2007, authorizing Parole, as a condition of *870 his release from prison, to search his “person, residence and property,” a search of his apartment had never before been conducted.
Parole compiled a list of 20 parolees to visit, including the five parolees chosen by Campbell and 15 others (two of whom were on a list submitted to Parole by the police). The parole officers then met with police officers at the 41st Precinct and provided them with the list of names and addresses of the parolees that were to be visited that evening. Two teams comprising both parole and police officers were each designated to visit 10 parolees. The police were present to obtain information from the parolees regarding the recent robberies and to provide security. According to the parole officers who testified, the purpose of the visits was to check on the parolees’ compliance with the conditions of parole.
A team including Parole Officers Campbell, Luis Loftin, and Andre Logan, and Police Officers Andrew Ulich, Joseph Piccioto, and other NYPD officers arrived at Walker’s apartment, in Bronx County, at approximately 10:30 p.m. In the apartment at the time were Walker and defendant, Walker’s stepson, who also lived in the apartment, as well as several other family members. Campbell told Walker that they were conducting a “special operation” and were going to search the apartment to ensure his compliance with the conditions of parole. Walker stepped aside to allow the officers in and Campbell, familiar with the layout of the apartment, walked directly to Walker’s bedroom where a search was conducted. A gun and bulletproof vest, among other things, were recovered from the closet. A gravity knife was recovered from a nearby nightstand. Police Officer Ulich handcuffed Walker, who then indicated that he kept more personal belongings in a hallway closet. Officer Ulich escorted Walker from the apartment, while Parole Officer Loftin searched the hallway closet and recovered another gun. He gave the gun to Police Officer Piccioto. Testimony regarding the statements made by Walker about the second gun was conflicting.* [2]
*871 Police Officer Ulich was called back into the apartment where Police Officer Piccioto handed him a shoebox containing two guns and told him that because defendant had been- “acting nervous,” he had asked him “where is it,” and defendant had responded, “I have a gun in the hallway closet.” Police Officer Piccioto did not tell Police Officer Ulich whether he had read defendant his Miranda warnings, or whether his gun had been drawn or defendant had been handcuffed at the time. Neither Police Officer Ulich nor Parole Officers Campbell or Loftin heard defendant make any statements in the apartment.[3] Both Walker and defendant were arrested.
At the 41st Precinct, defendant was placed in a holding cell uncuffed. At around 5:50 a.m., defendant was escorted by Police Officer Ulich, in handcuffs, to Sergeant William Estrada’s office, where the handcuffs were removed. Sergeant Estrada and his partner, Police Officer Manny Perez, were in plain clothes. Using a Miranda warning sheet, Perez advised defendant of his Miranda rights, and, after being asked if he understood each right, defendant said he did and wrote “yes” and his initials next to each one. Estrada wrote defendant’s pedigree information at the top of the sheet and defendant wrote his name at the bottom and signed the sheet; Estrada signed as a witness. Defendant answered questions about where he got the gun and about crime in the neighborhood. He then wrote out the following statement:
“That gun was my cousin’s. He left it at my house. He asked if he could leave it there for a couple of days. I said put it in my closet. I was at work around the time so when I came home there was gun in back of closet.”
Estrada wrote defendant’s pedigree information at the top of the statement sheet; although defendant provided a different name, he signed the statement “John Doe Tony” at approximately 6:00 a.m. Estrada also asked defendant about robberies in the area. There is no credible evidence that Estrada threatened defendant.
Detective Alejandro Zapata, formerly of the Gun Enhancement Unit, arrived at the 41st Precinct around 9:00 a.m. Officer Ulich handed him defendant’s written statement, the signed Miranda sheet, and a gun voucher, and told him that defendant had already been interviewed. In civilian clothes, Detective Zapata and his partner “re-interview[ed]” defendant in a “juve *872 nile room”; neither detective carried his weapon or handcuffs, and defendant’s hands were uncuffed during the meeting. Zapata introduced himself to defendant and, at about 9:05 a.m., began reading the Miranda warnings. After reading each right, the detective asked defendant if he understood and defendant said “yes” and wrote his initials next to each one. Zapata then asked defendant where he got the gun and defendant told him that “his cousin gave it to him, that he left it at his house and he put it in a closet, police came and they found it.” Zapata did not ask defendant to write out his statement because the substance was the same as his earlier written statement, but he included the substance of the statement in his DD5 report.
Conclusions of Law
Parole Search
Although as a condition of release on parole, a parolee signs an authorization that gives his parole officer the right to search his residence, person and property, “[t]hat authorization is not to be taken as an unrestricted consent to any and all searches whatsoever or as a blanket waiver of all constitutional rights to be secure from unreasonable searches and seizures.” (People v Huntley, 43 NY2d 175, 182 [1977].) “[A] parolee’s constitutional right to be secure against unreasonable search and seizures is not violated when his apartment is searched, without a search warrant, by his parole officer if the latter’s conduct is rationally and reasonably related to the performance of his duty as a parole officer.” {Id. at 179.) “It would not be enough necessarily that there was some rational connection; the particular conduct must also have been substantially related to the performance of duty in the particular circumstances.” {Id. at 181.)[4]
In Huntley, the Court of Appeals upheld the parole officer’s warrantless search of the defendant’s residence, finding that the search was reasonable where the defendant, after quitting his employment without informing his parole officer, lying about his employment status and accepting welfare payments without obtaining permission, twice failed to report to his parole officer in violation of the conditions of his parole. The Court concluded *873 that, where the defendant was home in the early afternoon without any discernable reason for his failure to report, the-parole officer’s search of the apartment “for a possible explanation of his otherwise unexplained failure to report was permissible.” (43 NY2d at 182.) Notably, the Huntley Court found “significant that there was no evidence that the searching parole officers were seeking contraband or evidence in aid of prosecution for criminal activity.” (Id.)
Other cases, following Huntley, make clear that parole officers may not lawfully search a parolee’s residence merely to assist the police in an investigation of criminal activity. In People v Candelaria (63 AD2d 85, 90 [1st Dept 1978]), the First Department determined that a defense motion to suppress should have been granted where the warrantless search of the defendant’s apartment was clearly designed to uncover evidence relating to a homicide and not evidence that the defendant had violated the conditions of parole. The Court, citing Huntley, concluded that, in conducting the search for evidence, the parole officers were acting as agents of the police:
“[A] parolee’s status ought not to be exploited to allow a search which is designed solely to collect contraband or evidence in aid of the prosecution of an independent criminal investigation. When the search is of such a nature, the parole officer becomes the conduit of the police officer in doing what the police officer could not do himself.” (Id. [citation omitted]; see also People v Mackie, 77 AD2d 778, 779 [4th Dept 1980] [search of a parolee’s residence, conducted by parole officer in aid of a police rape investigation, was not warranted where there was “no suggestion that (the parolee) was involved (in the rape) or that he was suspected of having violated his parole or having committed any other crime”]; People v Hill, 2002 NY Slip Op 50016[U] [App Term, 1st Dept 2002] [suppression required where the search of parolee’s residence was conducted by police and parole officers as part of a “special operation” to obtain evidence in a broad criminal investigation and the parole officers were merely conduits for doing what the police could not].)
There is no question that the special operation that led to the search of Walker’s residence was undertaken to assist the police in their investigation of ongoing criminal activity. The operation was initiated at the request of a police commander in order to *874 obtain information from parolees about a rash of robberies in a part of the Bronx. Two of the parolees selected to be visited were on a list compiled by the police; the others were selected by individual parole officers who were given no criteria for selection, save that the parolees reside within the area where the robberies were occurring. According to Parole Officer Derek Jones, the procedure to be followed, in the event any parolees had information about the robberies, was for the parole officers to ask the parolee to speak to the police. Of course, investigating the robberies was a police function, not the responsibility of Parole. Thus, Walker’s parole officer, Ronnita Campbell, testified that she was not interested in investigating the robberies. Defendant was, however, questioned about robberies by Sergeant Estrada.
There was testimony at the hearing that the search of Walker’s residence was also conducted to ascertain whether he was in violation of the conditions of parole. Here, however, the parole officers were not aware of any particular circumstances indicating that a search would further the performance of their duties, either to detect and prevent parole violations or promote the parolee’s reintegration into the community. This is in marked contrast to the circumstances in Huntley and other cases in which the Court of Appeals has upheld such searches. (See e.g. People v Johnson, 63 NY2d 888, 890 [1984] [search of parolee’s apartment by his parole officer, with police assistance, based on statement of parolee’s girlfriend that he admitted to possession of marijuana, “was in furtherance of parole purposes and related to his duty as a parole officer”]; cf. People v Hale, 93 NY2d 454, 462 [1999] [after probationer tested positive for drugs four times and probation officer received information that he was selling drugs out of his home, the search of the probationer’s residence was upheld where “the probation officer, although accompanied by the police, initiated and undertook the search . . . motivated by his duty to monitor the terms of defendant’s probation and rehabilitation”].)
Walker was not a suspect in and was not believed to have any specific information about or in connection to the influx of robberies the police were concerned about. And Parole had no reason to believe that Walker was in violation of the conditions of his parole. In fact, Walker was selected for the special operation precisely because there was no indication that he had either violated the conditions of his parole or was in danger of do *875 ing so. Campbell selected him because she believed “that [he] would be the one person that [she] would not have any problems [with] at his residence.” Although the parole officers may have intended to look for evidence of a parole violation, there were no particular circumstances to justify the search other than that it was part of a broader effort to assist the police in the investigation of robberies in the area. As discussed, that is not, in itself, a sufficient basis for a parole search. Since the search was not “rationally and reasonably related” to the performance of the duties of the parole officers, it was unlawful.
Consent
The People contend that, apart from its validity as a parole search, the search of the apartment was lawful because Walker consented to it. As noted, the blanket consent form that Walker signed as a condition of his release from prison only gave permission for searches rationally and reasonably related to the performance of the duties of his parole officer — and that was not the case here. The People also argue, however, that Walker’s conduct at the time of the search shows that he did, in fact, consent to it. The evidence does not support that conclusion.
Although a person may consent to the warrantless search of his home,
“[i]t is the People’s burden to establish the voluntariness of defendant’s consent, and that burden is not easily carried, for a consent to search is not voluntary unless ‘it is a true act of the will, an unequivocal product of an essentially free and unconstrained choice. Voluntariness is incompatible with official coercion, actual or implicit, overt or subtle.’ ” (People v Packer, 49 AD3d 184, 187 [1st Dept 2008], quoting People v Gonzalez, 39 NY2d 122, 128 [1976].)
Parole Officer Campbell reviewed the conditions of parole with Walker when he was assigned to her; he was surely aware that, as a condition of his release, he had signed a form giving blanket consent to all parole searches and that, if he violated any of Campbell’s instructions or refused to abide by the conditions of his parole, he could be violated. (See 9 NYCRR 8003.1 [b].) Furthermore, when Campbell arrived at the apartment, she told Walker that she was there to conduct a search — she did not ask for his permission. Accordingly, Walker’s conduct cannot be construed as giving consent to the search.
*876 Standing
It is apparent that defendant had a legitimate expectation of privacy in the area searched, given that he resided in the apartment and kept his belongings in the hallway closet where the firearm was recovered. (See People v Rodriguez, 69 NY2d 159, 162-163 [1987].) Since the search of the apartment was unlawful, and no voluntary consent to search was given, defendant may contest the legality of the search.
Statements
The minutes from defendant’s arraignment demonstrate that the People provided sufficient CPL 710.30 notice of the statements made by defendant to the police. With respect to defendant’s first oral statement, the People gave the following notice: “The defendant stated to the arresting officer on February 8, 2008 at approximately 10:30 p.m. in sum and substance, I have a gun in my closet in the hallway.” With respect to defendant’s written statement, the People provided the following notice:
“Additionally, the defendant stated to the arresting officer on February 9, 2008 at approximately 5:50 a.m. inside of the 41st Precinct in sum and substance, that gun was my cousin’s. He left it at my house. He asked can he leave it there for a couple of days. I said yes, and put it in my closet. I was at work at the time so when I came home there was a gun in the back of the closet.”
That the hearing testimony established that these statements were not actually made to the arresting officer, but instead to two other officers, is not fatal since the notices on their face were sufficient for the defendant to make a motion to suppress the statements (see People v Lopez, 84 NY2d 425 [1994]), which he did.
Although defendant’s third statement was not specifically mentioned at defendant’s arraignment, it is not precluded given that the substance of that statement was identical to defendant’s properly noticed written statement and made in the same location. (See People v Poole, 10 AD3d 581, 582 [1st Dept 2004], lv denied 3 NY3d 759 [2004]; People v Morris, 248 AD2d 169 [1st Dept 1998], affd 93 NY2d 908 [1999].) In any event, preclusion was waived since defendant “was granted a suppression hearing at which defendant received a full opportunity to be heard on the voluntariness of all of his written and oral statements.” (People v Garcia, 290 AD2d 299, 300 [1st Dept 2002], lv denied 98 NY2d 730 [2002]; People v Goss, 281 AD2d 298 [1st Dept 2001], lvs denied 96 NY2d 863, 866 [2001].)
*877 Having determined that defendant’s statements should not be precluded, the court must next consider their admissibility. With respect to the voluntariness of the statements, the People bear the burden of proving, beyond a reasonable doubt and from the totality of the circumstances, that the statements were voluntarily made. (See People v Huntley, 15 NY2d 72, 78 [1965].) Regarding defendant’s first oral statement, made in defendant’s apartment, the People failed to meet their burden. Police Officer Ulich testified that Police Officer Piccioto told him that because defendant had been “acting nervous,” he had asked defendant “where is it” and defendant had responded, “I have a gun in the hallway closet.” Police Officer Piccioto did not testify at the hearing and there was no testimony from Officer Ulich or any other prosecution witness regarding the circumstances under which the statement was made, i.e.,
“the amount of time the defendant spent with the police; how [his] freedom was restricted, if at all; the location and atmosphere of the questioning; the degree of cooperation that the defendant exhibited; whether' [he] was apprised of [his] constitutional rights; and whether the questioning was investigatory or accusatory in nature.” (People v Sullivan, 224 AD2d 460, 461 [2d Dept 1996].)
While the People were not required to have every officer who came in contact with defendant testify at the hearing (People v Witherspoon, 66 NY2d 973, 974 [1985]), it was necessary to call to the stand someone with knowledge of the circumstances surrounding defendant’s statement. Since the People provided no evidence regarding the voluntariness of defendant’s first oral statement, it must be suppressed.
Defendant’s motion to suppress his written and second oral statements is denied. Defendant’s written statement was made more than seven hours after the initial statement, in the 41st Precinct, to Sergeant Estrada after the Miranda warnings were administered. The second oral statement was made three hours after the written statement to Detective Zapata, who also administered the Miranda warnings to defendant. Thus, these statements were sufficiently attenuated from the earlier suppressed statement (see People v Chapple, 38 NY2d 112, 115 [1975]; People v Paulman, 5 NY3d 122, 130-131 [2005]; People v Daniels, 6 AD3d 245 [1st Dept 2004]). Since the conduct of the police and parole officers at the apartment was not flagrant, these same factors — the passage of time, the change in the police personnel doing the questioning and the repeated adminis *878 tration of Miranda warnings — serve to attenuate the statements made at the 41st Precinct from the unlawful search and subsequent arrest of defendant. The conduct was not flagrant because the officers were relying, albeit mistakenly, on the consent provided by Walker in his certificate of release as authority for the search. (See Brown v Illinois, 422 US 590 [1975]; People v Santos, 3 AD3d 317 [1st Dept 2004]; People v Chen Ren Jie, 280 AD2d 301 [1st Dept 2001].)
Accordingly, defendant’s motion to suppress the firearm and the oral statement he made to the police at the apartment is granted and the motion to suppress the written statement and the second oral statement is denied.

. Parole Officer Loftin testified that, prior to conducting the search of Walker’s residence, he heard that a firearm, bulletproof vest, and ammunition might be found in the apartment. The court does not credit this testimony, as Loftin could not recall the source of the information and none of the other *870 witnesses, including Walker’s own parole officer, recalled receiving any such information.

. Loftin testified that Walker said that the gun did not belong to him and, further, “He wants to play with guns, he’s got to handle it, referring to the defendant.” Campbell testified that Walker said that both guns belonged to him, that he kept them for protection, and that his son had never before been in trouble.

. Police Officer Piccioto did not testify at the hearing.

. In Samson v California (547 US 843 [2006]), the United States Supreme Court held that the suspicionless search of a parolee, conducted pursuant to a California statute requiring all parolees to consent to be searched at any time, did not violate the Fourth Amendment. It is far from certain, however, that Huntley was based solely on the Court’s interpretation of the Fourth Amendment. This court must consider Huntley controlling precedent, unless and until a higher court determines that is no longer the case.